UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALVIN PERKINS, JR., | ) | |
| | ) | |
| Plaintiff, | ) | 15 C 6188 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., DR. SALEH OBAISI, DR. ANDREW TILDEN, LATONYA WILLIAMS, JAMES CARUSO, JILL PARRISH, SHERRY BENTON, NICHOLAS LAMB, TARRY WILLIAMS, and RANDY PFISTER, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Alvin Perkins, Jr. sues Dr. Saleh Obaisi, Dr. Andrew Tilden, Latonya Williams, James Caruso, Jill Parrish, Sherry Benton, Nicholas Lamb, Tarry Williams, Randy Pfister, and Wexford Health Sources, Inc., alleging violations of 42 U.S.C. § 1983 arising from his medical treatment while incarcerated. Doc. 47. The individual defendants are sued in their individual capacities, not their official capacities. Doc. 71 at 2 n.1; Doc. 72 at 2 n.1.

Parrish has not appeared and may not have been served. Doc. 59 at 2. Latonya Williams and Caruso answered, and Wexford answered one claim against it. Docs. 60, 86. Pursuant to Federal Rule of Civil Procedure 12(b)(6), Pfister, Benton, Lamb and Tarry Williams ("State Defendants") move to dismiss the claims against them, while Dr. Obaisi, Dr. Tilden, and Wexford ("Wexford Defendants") move to dismiss the claims against Drs. Obaisi and Tilden and most of the claims against Wexford. Docs. 61, 65. The motions are granted.

1

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Perkins's briefs opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013). The facts are set forth as favorably to Perkins as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth those facts at this stage, the court does not vouch for their accuracy. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384 (7th Cir. 2010).

Perkins was incarcerated at Stateville Correctional Center from December 9, 2013 to December 11, 2014, at Pontiac Correctional Center from December 11, 2014 to March 11, 2015, and again at Stateville from March 11, 2015 to September 27, 2016. Doc. 47 at ¶ 5. Wexford contracts to provide health services at Pontiac and Stateville. *Id*. at ¶ 6. Drs. Obaisi and Tilden were employed by Wexford as the Medical Directors for Stateville and Pontiac, respectively. *Id*. at ¶¶ 7-8. During the relevant time frame, Benton was either the Chair or a member of the Illinois Department of Correction ("IDOC") Administrative Review Board ("ARB"), Lamb was Acting Warden of Stateville, Tarry Williams was Warden of Stateville, and Pfister was Warden of both Pontiac and Stateville. *Id*. at ¶¶ 12-15.

In August 2014, during his first stint at Stateville, Perkins developed a rash around his groin area. *Id*. at ¶ 25. He informed an unidentified nurse, who advised him to ask to see a

physician. *Ibid*. Perkins made an appointment request to the Stateville Health Care Unit ("HCU"), but never received a response. *Id*. at ¶ 26. In September, Perkins began to experience swelling and stiffness in his right index finger. *Id*. at ¶ 27. By October, those symptoms, which began to spread to his other fingers and left hand, had become debilitating, affecting his ability to perform simple tasks. *Id*. at ¶ 28. Meanwhile, the rash spread to his legs and arms and began to blister and scab, causing severe pain. *Id*. at ¶ 29. On October 12, Perkins submitted an additional request to the HCU, but again received no response. *Id*. at ¶ 30.

On October 18, Perkins submitted a grievance concerning the non-responses to his HCU requests. *Id*. at ¶ 31. He did not receive a response to the grievance. *Ibid*. Perkins made another appointment request to the HCU in late October, again receiving no response. *Id*. at ¶ 32. He filed another grievance in mid-November, complaining about the lack of medical treatment. *Id*. at ¶ 33.

On December 11, Perkins was transferred from Stateville to Pontiac. *Id*. at ¶ 35. In notes taken at a transfer screening, an unnamed medical professional, John Doe #1, did not refer to Perkins's hand pain or rash, and made one-word notes concerning his other long-term health conditions. *Id*. at ¶ 37. Doe #1 did not question Perkins about his health or examine him. *Id*. at ¶ 37. Perkins underwent a similarly meager evaluation the same day by another medical professional, John Doe #2. *Id*. at ¶ 38. Around this time, Perkins submitted a request for an appointment with the Pontiac HCU, and received no response. *Id*. at ¶ 39.

In late December, Perkins received a response to one of his Stateville grievances. *Id*. at ¶ 40. The response did not address the substance of the grievance, and instead stated that, due to his transfer to Pontiac, Stateville grievance officers would not review the grievance. *Ibid*. The response directed Perkins to appeal to the ARB, which he did shortly thereafter. *Id*. at ¶¶ 40-41.

In January 2015, Perkins submitted a grievance at Pontiac, again complaining of the lack of medical treatment. *Id*. at ¶ 42. The grievance complained that he had been requesting an HCU appointment, that he had a severe rash and was unable to use his right index finger, and that he had not received care at Stateville for those conditions. *Ibid*. Perkins did not receive a response to that grievance. *Ibid*.

On January 27, Perkins received the ARB's decision, prepared by Benton, on his original grievance. *Id*. at ¶ 43. The ARB summarily rejected the grievance on two grounds. *Ibid*. The first was that Perkins should have contacted the HCU before going to the ARB, and the second was that the grievance failed to satisfy certain requirements of the Illinois Administrative Code. *Ibid*. Specifically, the ARB stated that the grievance contained no date from which the ARB could determine whether he had complied with the requirement that an inmate file a grievance within 60 days of his discovery of the grievance's subject matter. *Ibid*. The ARB also stated that the grievance had insufficient factual detail. *Ibid*.

In March, Perkins saw a nurse at Pontiac, John Doe #3, about his rash, which by then had spread to his arms and legs. *Id*. at ¶ 44. Doe #3 prescribed hydrocortisone cream, but did not examine Perkins for any contraindicated conditions such as open wounds, lesions, or fungal infections. *Ibid*. Upon seeing Doe #3 again shortly thereafter, Perkins reported that the cream was not working and complained of the hand pain and mobility issues. *Id*. at ¶ 45. Doe #3 did not indicate any further follow-up or treatment. *Ibid*.

A few days later, Perkins met with Caruso, a physician's assistant. *Id*. at ¶ 46. Caruso noted the rash, but conducted no examination and wrote that Perkins "leaves [Pontiac] Wednesday [March 11, 2015] – so he won't receive cream." *Ibid*. That same day, in preparation

for Perkins's transfer back to Stateville, Caruso prepared a health summary that did not note either the hand condition or the rash. *Id*. at ¶ 47.

On or about March 11, Perkins returned to Stateville. *Id*. at ¶ 48. During an intake screening, another unidentified medical professional, John Doe #4, noted that Perkins had no current complaints, but did not question him about his health. *Ibid*. In March, Perkins submitted another grievance at Stateville concerning lack of medical care, to which he never received a response. *Id*. at ¶ 51.

In May, after his pain worsened, Perkins saw another medical professional, John Doe #5, to whom he complained about his pain, including in his lower back and right shoulder. *Id*. at ¶ 53. However, Perkins received only ibuprofen, and Doe #5 did not examine his fingers or hands. *Ibid*. Perkins continued to have pain and to go without treatment despite making further requests to the HCU. *Id*. at ¶ 54.

Perkins submitted another grievance on June 29, asserting that he had been denied medical care and asking prison administrators to intervene. *Id*. at ¶ 55. Parrish, a grievance officer, took no action based on a representation from medical staff that Perkins's records did not refer to pain in his fingers or hands. *Id*. at ¶ 57. Lamb, then Acting Warden at Stateville, approved the report, and Perkins appealed to the ARB. *Ibid*.

After his back pain was exacerbated by a fall, Perkins again sought medical attention. *Id*. at ¶¶ 58-59. Perkins met with another unidentified medical professional, John Doe #6, who noted his extreme pain and limited motion, but indicated that a referral to a physician was appropriate only if his symptoms did not improve after 48 hours. *Id*. at ¶ 59. Doe #6 did not order any pain medication despite noting Perkins's hand pain. *Ibid*.

On August 5, Perkins heard an announcement that sick calls that day were cancelled, and he thus did not attend a scheduled appointment at the HCU that same day. *Id*. at ¶ 61. However, it turned out that the HCU had not cancelled his appointment; as a result, the HCU duty nurse considered his absence a refusal of treatment and did not reschedule the appointment. *Ibid*.

Approximately ten days later, Perkins submitted another grievance, asserting that he been improperly denied the opportunity to see a physician concerning his hand pain. *Id*. at ¶ 62. Parrish again denied this grievance, this time based on the understanding that Perkins had refused treatment by failing to go to his August 5 appointment. *Id*. at ¶ 63. Lamb summarily approved the denial, and Perkins again appealed to the ARB. *Id*. at ¶ 64.

In October, the ARB, in decisions signed by Benton, ruled on Perkins's pending grievances. *Id*. at ¶¶ 65-66. Benton rejected the first, reasoning that the ARB had already addressed the issue in connection with his prior grievance, and determining that, in any event, the grievance lacked sufficient detail. *Id*. at ¶ 65. Benton rejected the second because it was untimely, having been submitted more than 60 days after the complained-of conduct. *Id*. at ¶ 66.

Later that month, Perkins again saw Doe #5. *Id*. at ¶ 67. Doe #5 noted Perkins's conditions, but did not make a referral for his hand or back pain. *Ibid*. Doe #5 also did nothing for the rash, beyond ordering the same hydrocortisone cream that Perkins had previously tried. *Ibid*.

In November, Perkins saw Latonya Williams, a physician's assistant, for the first time; she diagnosed the rash as dermatitis but did not physically examine his inner thighs or groin area to determine the cause of the rash, and did not refer Perkins to a specialist. *Id*. at ¶ 68. Latonya Williams also diagnosed Perkins's hand pain as "probable" osteoarthritis, prescribed a one-month course of Tylenol, and suggested that the back pain was "probabl[y]" attributable to a

degenerative joint disease. *Id.* at ¶ 69 (alteration in original). However, she failed to ask standard questions in her examination, did not schedule any follow-up appointments, and performed no physical testing besides a single test of Perkins's grip strength. *Ibid.*

The operative complaint, filed by able recruited counsel, sets forth five claims for relief, all under the Eighth Amendment via 42 U.S.C. § 1983. Doc. 47. Count I alleges deliberate indifference to Perkins's medical needs against Dr. Obaisi, Dr. Tilden, Latonya Williams, Caruso, Lamb, Tarry Williams, Pfister, Wexford, and Does #1-6. *Id.* at ¶¶ 73-82. Count II alleges deliberate indifference based on the failure to diagnose and treat Perkins's arthritis against Latonya Williams, Caruso, Does #3-6, and Wexford. *Id.* at ¶¶ 83-92. Count III is against most of the same Defendants (Does #4 and #6 are not named) and alleges deliberate indifference based on a failure to adequately examine, diagnose, and treat Perkins's rash. *Id.* at ¶¶ 93-102. Count IV is a *Monell* claim against Wexford, Dr. Obaisi, and Dr. Tilden, alleging that they maintained constitutionally insufficient policies, practices, and customs for medical treatment at Stateville and Pontiac. *Id.* at ¶¶ 103-21. Finally, Count V alleges that Benton, Lamb, Parrish, Tarry Williams, and Pfister were deliberately indifferent to Perkins's medical needs by refusing to properly consider his grievances and maintaining inadequate grievance policies and procedures. *Id.* at ¶¶ 122-31.

## Discussion

### I. Wexford Defendants

Wexford seeks dismissal as to Counts I-III, not Count IV. Wexford is considered a municipality under § 1983 and therefore cannot be held vicariously liable for its employees' conduct. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014) ("In a number of decisions since *Monell*, our court has applied the *Monell* standard to private corporations."); *see*

*also Hahn v. Walsh*, 762 F.3d 617, 639-40 (7th Cir. 2014) (stating that overruling *Shields* would require an "intervening on-point Supreme Court decision") (citation and internal quotation marks omitted). Accordingly, to proceed against Wexford, Perkins must allege that Wexford had a "policy or custom … [that] inflict[ed] the injury … [and was] the moving force of the constitutional violation" he suffered. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). In Counts I-III (as opposed to Count IV), Perkins does not plead that Wexford has met the *Monell* standard. Perkins acknowledges this and states that he seeks to preserve the issue for further review. Doc. 71 at 5-7. Accordingly, Wexford is dismissed from Counts I-III.

Drs. Obaisi and Tilden seek dismissal of all of the counts (I-IV) stated against them. Deliberate indifference requires "actual knowledge of an impending harm," *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010), and "personal involvement in the alleged constitutional deprivation," *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003). "Although direct participation is not necessary, there must at least be a showing that the [defendant] acquiesced in some demonstrable way in the alleged constitutional violation." *Ibid*. The complaint does not allege that Drs. Obaisi or Tilden were personally involved in Perkins's treatment, nor that they had the requisite awareness of Perkins's medical conditions or course of treatment as to demonstrably acquiesce in the violation.

Perkins contends that the doctors' personal involvement may be inferred at the pleading stage due to the high-level position (Medical Director) that they held. Doc. 71 at 2, 4-5. The cases cited by Perkins do not support his position. Both *Myrick v. Anglin*, 496 F. App'x 670 (7th Cir. 2012), and *Williams v. Prison Health Services, Inc.*, 167 F. App'x 555 (7th Cir. 2006)—the latter of which may not be cited, *see* 7th Cir. R. 32.1(d)—are distinguishable because the plaintiffs there actually alleged the high-level officials' personal involvement. *See Myrick*, 496

F. App'x at 675 (noting that the plaintiff alleged that he "complained … directly" to the defendant "healthcare administrator"); *Williams*, 167 F. App'x at 558 (noting that the plaintiff wrote directly to the defendant medical director to inform her of his concerns about his treatment). The same holds for *Nunez v. Spiller*, 2015 WL 3419513, *2 (S.D. Ill. May 28, 2015), where the plaintiff alleged that he "beg[ged]" the health care administrator "for help, but was ignored" and that the medical director "denied [him] treatment" (alteration in original).

Perkins offers no authority, and the court is unaware of any, holding that an individual defendant's status as a high-level employee, standing alone, supports a reasonable inference of personal involvement in a specific constitutional deprivation suffered by an inmate. In fact, the law holds otherwise. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1429 (7th Cir. 1996) (dismissing claims against the Cook County Sheriff and Director of the Cook County Department of Corrections because they alleged only "clearly localized, non-systemic violations"); *Crowder v. Lash*, 687 F.2d 996, 1006 (7th Cir. 1982) (rejecting the conclusion that "any well informed Commissioner of Corrections" could be held "personally liable for damages flowing from any constitutional violation occurring at any jail within that Commissioner's jurisdiction," reasoning that "such a broad theory of liability is inconsistent with the personal responsibility requirement for assessing damages against public officials in a section 1983 action").

Count IV, a *Monell* claim against Wexford and Drs. Obaisi and Tilden, alleges unconstitutional policies, practices, or customs, but to the extent that Drs. Obaisi and Tilden created or implemented them, they did so as Wexford employees in their official capacities. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 478-79 (1986) (explaining that "*Monell* is a case about responsibility," insofar as it holds that "local government units [can] be made liable under § 1983 for deprivations of federal rights," and thus that *Monell* is concerned with

"distinguish[ing] acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal lability is limited to action for which the municipality is actually responsible") (emphasis in original); *Guillory v. Orange Cnty.*, 731 F.2d 1379, 1382 (9th Cir. 1984) (noting that "*Monell* does not concern liability of individuals acting under color of state law"); *see also Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent.") (citations and internal quotation marks omitted). Even if Perkins had not relinquished any official capacity claims against Drs. Obaisi and Tilden, Doc. 71 at 2 n.1, those claims would be entirely duplicative of the *Monell* claim against Wexford itself, *see Monell*, 436 U.S. 658 n.55 (noting that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"), and thus subject to dismissal on that ground, *see Pumputiena v. Deutsche Lufthansa, A.G.*, 2017 WL 66823, at *6 (N.D. Ill. Jan. 6, 2017) (collecting cases).

## II.     State Defendants

As noted, Count I alleges an Eighth Amendment violation based on inadequate medical treatment. Doc. 47 at ¶¶ 73-82. Lamb, Tarry Williams, and Pfister move to dismiss Count I on the ground that the complaint does not establish their personal involvement in the alleged violations. Doc. 66 at 4-7. Specifically, they argue that their status as wardens does not imply any personal involvement in any medical deprivation Perkins may have suffered.

As shown above, an individual defendant's high-ranking position, standing alone, does not give rise to a reasonable inference that the defendant was involved in a constitutional deprivation. Perkins correctly responds that personal involvement may be inferred where the

10

alleged violations alleged are systemic, rather than individualized, *see Antonelli*, 81 F.3d at 1429, but that principle does not save Count I against the three wardens because the violations alleged there are non-systemic. Count I concerns only the denial of Perkins's individual (if repeated) requests for treatment, and *Antonelli* holds that violations relating to such denials are non-systemic. *Id*. at 1429; *see also Potts v. Moreci*, 12 F. Supp. 3d 1065 (N.D. Ill. 2013).

True, Perkins alleges inadequate treatment on many occasions. However, beyond formulaic allegations concerning unspecified policies and practices, Doc. 47 at ¶ 79, he does not allege that Pfister, Tarry Williams, or Lamb in any way caused a systemic problem that resulted in the treatment denials. Those defendants accordingly are dismissed from Count I. Should discovery uncover information supporting the existence of systemic issues, Perkins at that point may move to amend to add one or all of the wardens back to Count I.

Count V, which names the three wardens plus Benton, alleges an Eighth Amendment violation based on an inadequate grievance process. Doc. 47 at ¶¶ 122-31. Governing precedent holds that "the inadequacies of the grievance procedure itself, as distinct from its consequences, cannot form the basis of a constitutional claim." *Kervin v. Barnes*, 787 F.3d 833, 835 (7th Cir. 2015); *see also Bridges v. Gilbert*, 557 F.3d 541, 555 (7th Cir. 2009); *Grieveson v. Anderson*, 538 F.3d 763, 772-73 (7th Cir. 2008). Moreover, where a complaint alleges "no personal involvement by the warden outside of the grievance process, … [the] complaint … fails to state a claim." *Gevas v. Mitchell*, 492 F. App'x 654, 660 (7th Cir. 2012); *see also George v. Smith*, 507 F.3d 605, 609-10 (7th Cir. 2007) ("Ruling against a prisoner on an administrative complaint does not cause or contribute to [a constitutional] violation.").

*Grieveson* holds that inadequacies in the grievance process may be actionable if they *cause* a constitutional violation, *see* 538 F.3d at 772-73, but Perkins's allegations do not state

11

such a claim. Any constitutional deficiency in Perkins's medical treatment resulted from failures on the part of his treaters and possibly HCU's failures to properly schedule appointments. The complaint does not allege, in anything beyond the most conclusory terms, that inadequacies in the grievance procedure itself had anything to do with the medical care Perkins did or did not receive. Accordingly, Count V is dismissed in its entirety.

## Conclusion

The motions to dismiss are granted. All claims against Drs. Obaisi and Tilden are dismissed; Wexford is dismissed from Counts I-III; all claims against Lamb, Tarry Williams, and Pfister are dismissed; and Count V is dismissed in its entirety. The dismissals are without prejudice to Perkins filing a third amended complaint—which would be only his second counseled complaint. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) ("Ordinarily, … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed.").

Perkins has until November 28, 2017, to file a third amended complaint. If Perkins does not amend, any defendant who has not yet answered shall answer the surviving portions of the second amended complaint by December 5, 2017. If Perkins amends, Defendants shall answer or otherwise plead by December 12, 2017.

November 3, 2017

_____
United States District Judge